DANIEL J. O'HERN, JR., ESQ. (DO0138)
BECKER MEISEL LLC
499 Broad Street
Shrewsbury, New Jersey 07702
(732) 576-8700

SCOTT J. FERRELL, Cal. Bar No. 202091 (*pro hac vice pending*)
DAVID R. SUGDEN, Cal. Bar No. 218465 (*pro hac vice pending*)
CALL, JENSEN & FERRELL
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
(949) 717-3000

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORTEL NETWORKS LIMITED, a Canadian corporation; NORTEL NETWORKS, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>vs.<br><br>TELQUEST INTERNATIONAL CORPORATION, a New Jersey Corporation; ALFRED ADEL, an Individual; and DANNY PEKAR, an Individual<br><br>Defendants. | Case No. 07-5294 (KSH)(PS)<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br><br>"Document Electronically Filed" |

Plaintiffs Nortel Networks Limited and Nortel Networks Inc. by way of Complaint against defendants TelQuest International Corporation ("TelQuest"), Alfred Adel ("Mr. Adel"), and Danny Pekar ("Mr. Pekar") (collectively referred to herein as "Defendants") allege as follows:

## I.    JURISDICTION AND VENUE

1.    This is an action for copyright infringement pursuant to 17 U.S.C. § 101 *et seq.*, violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125 *et seq.*, unfair competition, and conversion.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1338(a) & (b), and this Court's pendent jurisdiction.

2.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to these claims occurred in this District, and TelQuest's principal place of business is located in this District.  Venue is proper in this vicinage pursuant to Local Civil Rule 40.1 because TelQuest resides within Essex County, New Jersey.

## II.    PARTIES

3.    Plaintiff, Nortel Networks Limited ("NNL"), is a company organized and existing under the laws of Canada.

4.    Plaintiff, Nortel Networks Inc. ("NNI"), is a company organized and existing under the laws of Delaware with its principal place of business located at 2221 Lakeside Boulevard, Richardson, Texas.  Nortel is registered to do business in the State of New Jersey.

5.    NNI is the United States subsidiary of NNL.  (NNL and NNI are hereinafter collectively referred to herein as "Nortel").

6.    Defendant TelQuest International Corporation ("TelQuest") is a New Jersey corporation with its principal place of business at 26B Commerce Road, Fairfield, New Jersey.  TelQuest is engaged in the business of buying, selling, and repairing new and used telecommunications equipment.

7.    Upon information and belief defendant Alfred Adel ("Mr. Adel") is the president of TelQuest and a resident of the State of New Jersey, residing in Towaco, New Jersey.

8.     Upon information and belief defendant Danny Pekar ("Mr. Pekar") is an individual employed by TelQuest, and the nephew of Mr. Adel.

9.     As used herein, TelQuest, Mr. Adel, and Mr. Pekar are often collectively referred to as "Defendants."   Upon information and belief, Defendants participated in, exercised control over, and/or benefited from the infringing and unlawful activities described herein, and are therefore jointly and severally liable.

10.     Defendants are also believed to have a direct financial interest in, and supervised, the infringing and unlawful activities described herein.

### III.    FACTS

**A.     Nortel Is The Industry Leader In The Field Of Global Telecommunications.**

11.     Nortel was founded in 1895 as Northern Electric and Manufacturing ("Northern").  Northern celebrated its first 100 years with the introduction of the "Nortel" brand, which reflected the company's evolution from telephony to multi-service Internet and Internet Protocol ("IP") based global communication solutions.  Since the invention of the telephone, Nortel has been a constant innovator and pioneer in the business of communications.  Today, Nortel is an industry leader and innovator in the field of global telecommunications and conducts business in more than 150 countries.

12.     Nortel's core products include telecommunication systems for business users. For example, some of Nortel's most innovative and successful products are (a) Nortel Networks Norstar, which supports up to 240 telephones and has an ability to drive multiple integrated applications, (b) Business Communications Manager ("BCM"), which has achieved the top North American market share in its category, and (c) the Call Pilot, which is a unified messaging application that combines voicemail, e-mail and fax messages into a single mailbox, accessible by phone, any desktop PC, or mobile e-mail enabled devices.

**B.      Nortel Is The Owner Of Its World Famous Mark.**

13.      On September 17, 1996, the Nortel mark was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 2001714. Attached hereto as Exhibit "A" is a true and correct copy of the printout of the page from the United States Patent and Trademark Office's website identifying the Registration of the Nortel mark.

14.      On August 25, 1998, the Nortel mark with the astrolabe design was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 2184321.  Attached hereto as Exhibit "B" is a true and correct copy of the printout of the page from the United States Patent and Trademark Office's website identifying the Registration of the Nortel mark with the astrolabe design.  The Nortel mark with the astrolabe design is as follows:

# NORTEL

15.      On September 2, 2003, the Nortel Networks mark was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 2757769.  Attached hereto as Exhibit "C" is a true and correct copy of the printout of the page from the United States Patent and Trademark Office's website identifying the Registration of the Nortel Networks mark.

16.      On December 17, 2002, the Nortel Networks mark with the astrolabe design was registered on the Principal Register of the United States Patent & Trademark Office as Registration No. 2663562.  Attached hereto as Exhibit "D" is a true and correct copy of the printout of the page from the United States Patent and Trademark Office's website identifying the Registration of the Nortel Networks mark with the astrolabe design.  The Nortel Networks mark is as follows:

# NORTEL NETWORKS

17.     Nortel has registered a variety of trademarks, including the ones identified above, on products including telecommunications equipment (including telephones, telephone switches, cellular mobile equipment, wireless communications products, fibre optic cable, transmission equipment), computer software, and telecommunication service (including engineering services in the field of telecommunications such as installation, maintenance, repair services, distributorship services and operational services).  Nortel's right to use in commerce the Nortel and Nortel Networks marks has become incontestable pursuant to 15 U.S.C. § 1065.

18.     The registrations of these and other Nortel marks are valid, subsisting, and exclusively owned by Nortel.  Nortel's marks have been continually used by Nortel throughout the world and in the United States, including New Jersey, on or in connection with the manufacture, distribution, sale, promotion, and servicing of its products.

19.     As a result of Nortel's widespread and continuous use, advertisement, promotion, and service of its products in connection with its marks, they have become widely known and recognized as identifying Nortel as the source of products and services distinguishable from other products and services.  Nortel's marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public throughout the world and in the United States, including New Jersey.  Nortel's marks have acquired a secondary meaning throughout the world and in the United States, including New Jersey.

## C.     Nortel Sells And Services Its Products Through Authorized Nortel Distributors.

20.     In order to maintain the high quality of Nortel's products, services, and customer satisfaction, Nortel sells its products through authorized Nortel distributors.

Nortel requires that its authorized distributors adhere to stringent procedures in order to maintain the high quality standards of Nortel's products.   For example, authorized distributors are contractually required to: (1) employ a competent and aggressive sales and technical support organization; (2) establish, staff, and maintain service centers, in sufficient numbers, to support the installation, warranty, and post warranty maintenance requirements for the products; (3) provide installation and repair activity using materials that meet Nortel's minimum quality specifications as published in relevant support documentation; (4) provide sufficient initial and periodic supplemental training to its engineering and other technical support staff; (5) provide appropriate facilities, tools and equipment; (6) perform and comply with all discount or promotional programs; (7) meet all eligibility standards that Nortel may require for a designated product; (8) comply with all applicable industry standards for sales and support of the Nortel products sold; (9) install and maintain the products in a manner which will neither damage the quality or functionality of the products nor require extraordinary technical support; (10) be responsible for addressing all warranty issues with its customers; (11) offer a warranty to all end users where applicable; (12) be responsible for customer satisfaction; (13) be responsible for sending employees or subcontractor employees to required training and, if applicable, paying for such training; and (14) purchase all hardware and software requirements from Nortel.   The foregoing requirements employed by Nortel are an integral part of Nortel's ability to maintain the quality of its products and the valuable goodwill of its marks.

**D.     The GenKey Software Is A Proprietary Software Owned By Nortel And Protected By Registered Copyright.**

21.     One of the most valuable features of Nortel products is their ability to expand and handle more users and functions.   This allows a business to buy a base telecommunications system that grows in functionality as the company grows.   For

example, a business can purchase a BCM with twenty voice mailboxes. As the company grows, the number of voice mailboxes on the BCM can increase without having to incur the expense or disruption of needing a new BCM system installed.

22. Instead, the growing company can simply contact Nortel or one of Nortel's authorized distributors to expand the voice mailboxes on the existing BCM for a fee. Specifically, the consumer will purchase an "authorization code," which is provided in a shrink-wrapped package. The consumer will then provide the system's identification number and authorization code to Nortel or an authorized Nortel distributor. Nortel's copyrighted GenKey Application Software (the "GenKey Software") then uses the authorization code and system identification number to generate a keycode (the "Nortel Keycodes") for that specific BCM. The Nortel Keycode is input into the existing BCM, and the number of voice mailboxes is increased.

23. In other words, the Nortel Keycodes are generated by the GenKey Software to expand the number of features on Nortel's products. Just like customers of DIRECTV, who must create an account and obtain an access card to view in an "unscrambled" format those channels to which the customer has subscribed or purchased, the GenKey Software generates the Nortel Keycodes to allow customers to purchase additional features on its products.

24. The GenKey Software is proprietary software owned by Nortel and protected by a registered copyright. Attached hereto as Exhibit "E" is a true and correct copy of the Certificate of Registration for the GenKey Application Software. The GenKey software is crucial to the viability of Nortel's telecommunications products and software based profit model. Without GenKey, the users of Nortel products would not be able to expand or enhance their systems. These expansions and enhancements are major revenue sources for Nortel.

**E.      Use Of The GenKey Software Is Strictly Prohibited Outside Of Nortel: Authorized Nortel Distributors Are Not Even Permitted To Use It.**

25.      Because of the unique, valuable, and proprietary nature of the GenKey Software, the use of the GenKey Software is strictly prohibited for use by anyone outside of Nortel.  Thus, any Nortel employee or agent who is given access to the GenKey Software is bound by a confidentiality agreement that they are required to sign upon commencing employment at Nortel, including the Nortel Networks Agreement Relating to Intellectual Property and Confidentiality.

26.      Authorized Nortel distributors are not even permitted to use or be in possession of the GenKey Software.  Instead, authorized Nortel distributors are provided access to Nortel's Key Retrieval System ("KRS"), which is a website only available to authorized Nortel distributors.  On KRS, authorized Nortel distributors are able to input an authorization code and the Nortel product's system identification number.  KRS then utilizes the GenKey Software to generate and provide the authorized distributor with a Nortel Keycode without the authorized distributor ever being able to possess, use, or acquire the GenKey Software.

27.      If a party outside of Nortel is in possession of the GenKey Software, it allows that party to (1) generate and sell Nortel Keycodes to people who wish to upgrade their Nortel phone system, (2) if that party is already in possession of a Nortel phone system, upgrade the phone system "in-house" for free without Nortel ever knowing or receiving any consideration, and/or (3) sell Nortel phone systems that were upgraded "in-house."

28.      Defendants are not, and never have been, authorized Nortel distributors. Defendants are not, and never have been, employees or agents of Nortel.

**F.      Nortel Discovers That Defendants Sold Illegally Upgraded Nortel Products.**

29.     Nortel recently learned that Defendants have used an unauthorized copy of the GenKey Software to illegally upgrade Nortel products and illegally generate Nortel Keycodes.

30.     Defendants are not, and never were, authorized Nortel distributors or partners.

31.     On January 7, 2005, TelQuest invoiced LTC, Inc. ("LTC") for two BCMs: (1) a BCM 400; and (2) a BCM 200.  The invoice from TelQuest to LTC indicated that both BCMs came with a BCM 4 trunk gateway and a BCM 16 station media (i.e., a Call Pilot voicemail with 16 activated mailboxes).  Nortel Keycodes are necessary for both of these upgrades on the BCMs that TelQuest sold to LTC.

32.     An end user company called Crawford Supply Company ("Crawford Supply") purchased the BCMs described in the above paragraph from LTC.

33.     In the Summer of 2007, Crawford had to reload the Nortel Keycodes that were loaded on its BCM 200 due to a defect with the base tray function card.  Crawford Supply was unable to retrieve the Nortel Keycodes and, because it knew that LTC had purchased the BCMs from TelQuest with the software already loaded, it requested that TelQuest re-send the Nortel Keycodes for the BCM 200.

34.     TelQuest informed Crawford Supply that it no longer had any record of the Nortel Keycodes that were previously loaded because it only kept Nortel Keycode records for a couple years.  Crawford Supply asked TelQuest to contact Nortel and opined that, similar to companies like Microsoft, Nortel should have some records or registry of Nortel Keycodes being sold and loaded on its products.

35.     TelQuest did not contact Nortel and instead advised Crawford Supply that it would purchase new Nortel Keycodes for its BCM 200.  On August 2, 2007, David Adel of TelQuest emailed Dan Crawford of Crawford Supply the Nortel Keycodes necessary to re-upgrade Crawford Supply's BCM 200.

36.    Concerned with TelQuest's inability to obtain the previously issued Nortel Keycodes, Dan Crawford contacted Nortel and provided Nortel with the system identification numbers of the BCM 200 and BCM 400 that came from TelQuest.

37.    On the BCM 200 (the BCM that failed and needed new Nortel Keycodes), KRS shows that Nortel Keycodes were registered on August 2, 2007. Prior to August 2, 2007, however, the only software registered to the BCM 200 was a 3.7 software upgrade registered on September 27, 2005. Prior to August 2, 2007, KRS does not show any record of the BCM 200 having a BCM 4 trunk gateway or a 16 station media (i.e., a Call Pilot voicemail with 16 activated mailboxes). In other words, TelQuest sold LTC a BCM 200 that was upgraded without KRS issuing a valid Nortel Keycode.

38.    On the BCM 400, KRS does not show any record of a BCM 4 trunk gateway or a 16 station media (i.e., a Call Pilot voicemail with 16 activated mailboxes). The only software registered to the BCM 400 is a 3.7 software upgrade registered on September 27, 2005. In other words, TelQuest sold LTC a BCM 400 that was upgraded without KRS issuing a valid Nortel Keycode.

**G.    Former TelQuest Employee Confirms That TelQuest Possessed And Used An Illegal Copy Of GenKey To Sell Illegally Generated Nortel Keycodes Or Illegally Upgraded Nortel Products.**

39.    Former TelQuest employee Jason Hines worked at TelQuest from January 2001 until January 2006. As part of his duties at TelQuest, he was responsible for buying and selling Nortel telephone systems. He was also responsible for selling Nortel Keycodes.

40.    When Mr. Hines began working for TelQuest, he would obtain Nortel Keycodes to either (1) upgrade a telephone system, or (2) sell the Nortel Keycode to a customer. He would obtain a Nortel Keycode by providing TelQuest's president Alfred Adel with a piece of paper with the telephone system's system identification number

written down.  Mr. Adel would take the number and a short time later return with a Nortel Keycode written down on a piece of paper.  Mr. Hines would, in turn, either sell the customer that Nortel Keycode or give the Nortel Keycode to one of TelQuest's technicians to load onto the Nortel telephone system.

41.    Sometime thereafter, the process for upgrading Nortel telephone systems changed.  Rather than obtaining a Nortel Keycode from Mr. Adel and giving it to a technician as described above, Mr. Adel's nephew, Danny Pekar, would take Nortel's telephone systems off TelQuest's premises.  Mr. Pekar would be gone for several hours and return with all of the telephone systems upgraded.  To illustrate, he would load his car with several Call Pilots without any upgrades: the CallPilot 100s had 10 voicemail boxes and the CallPilot 150s had 20 voicemail boxes.  When he would return, the CallPilots would be upgraded with "unlimited voicemail boxes": the CallPilot 100s would have 40 voicemail boxes and the CallPilot 150s would have 200 voicemail boxes.

42.    According to Mr. Hines, whenever TelQuest would obtain new CallPilots, they would be immediately upgraded.  When new CallPilots would arrive, the authorization codes would be removed and the CallPilots would be upgraded (some would be upgraded to have 32 voicemail boxes while others were upgraded to have unlimited voicemail boxes).  The authorization codes removed from the boxes were saved so TelQuest could sell "legitimate" CallPilots to customers TelQuest had suspicions about.  Mr. Adel explained that Nortel would hire companies to make purchases on its behalf.  To avoid selling an illegally upgraded telephone system to one of these companies, Mr. Hines and other TelQuest employees were instructed to sell regular CallPilots with authorization codes to these companies.  Mr. Adel would also tell Mr. Hines and other TelQuest employees to contact him before we ever sold a CallPilot to a new customer.

43.    Mr. Adel also made efforts to hide TelQuest's records of past Nortel telephone system upgrades.  For example, he put password protections on all TelQuest transactions so employees could not obtain serial number records or other records revealing when and

how Nortel telephone systems were upgraded with Nortel Keycodes or how or when TelQuest sold Nortel Keycodes.  If TelQuest employees needed to get a particular invoice for a particular customer, they would have to ask Mr. Adel for it.  Mr. Adel would ask why the invoice was needed.  In most cases, Mr. Adel would refuse to give out the invoice and told employees to tell the customer that TelQuest's "system is down" or that the invoice was "unavailable."

## IV.    FIRST COUNT

### (Copyright Infringement, 17 U.S.C. § 101 *et seq.*)

44.    Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 43, inclusive, and incorporates them by this reference herein.

45.    Nortel's copyrighted GenKey Software is entitled to protection under the copyright laws of the United States pursuant to the Berne Convention, of which the United States and Canada are members.  By means of the actions complained of herein, Defendants have infringed and will continue to infringe Nortel's copyrights in and relating to the GenKey Software, by producing, distributing, and placing upon the market products or portions thereof which were copied, generated and/or produced from Nortel's copyrighted GenKey Software.

46.    Nortel is entitled to an injunction restraining Defendants, their officers, agents, employees, and all persons acting in concert with them from engaging in further such acts in violation of the copyright laws.

47.    Nortel is further entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged.  The amount of such damages cannot be determined at this time.  Nortel is also entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged.  Nortel is unable to ascertain at

this time the full extent of the gains, profits, and advantages Defendants have obtained by reason of their aforesaid acts of copyright infringement.

48.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## VI.    SECOND COUNT

### (Trademark Infringement (15 U.S.C. § 1114 *et seq.*))

49.    Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 48, inclusive, and incorporates them by this reference herein.

50.    Nortel has long used several trademarks including, but not limited to, the Nortel mark with the astrolabe design and the Nortel Networks mark.  Nortel is the owner of these world famous marks.  As discussed above, Nortel's marks have come to represent and symbolize the excellent reputation of Nortel's products, services, and valuable goodwill among members of the public and in the United States, including New Jersey.

51.    As discussed above as well, Nortel requires that its authorized distributors adhere to strict obligations so that Nortel can exercise control over the distribution, handling, and sale of its trademarked products.  Indeed, Nortel has (1) established legitimate and substantial quality control procedures to maintain the excellent reputation of its products, services, and valuable goodwill, (2) abides by these legitimate and substantial quality control procedures, and (3) sales of Nortel products that were not required to adhere to these control procedures can result in inferior products and services and can diminish Nortel's marks.

52.    In deliberate violation of Nortel's exclusive rights in the Nortel trademarks, TelQuest has offered for sale, sold and distributed in this District and perhaps elsewhere

under the Nortel Trademarks illegally upgraded Nortel products which have not otherwise been authorized by Nortel.

53.     Defendants' acts have caused and, unless restrained by this Court, will continue to cause Nortel and the public to suffer great and irreparable damage and injury through, *inter alia*, (1) a likelihood of confusion, mistake, and deception among the relevant purchasing public and trade, and (2) the loss of Nortel's valuable goodwill and business reputation symbolized by Nortel's marks.

54.     Nortel has suffered loss of profits and other damage, and Defendants have earned illegal profits, in an amount to be proven at trial, as the result of the aforesaid acts of Defendants.  Nortel may elect, at the time of trial, and in the alternative statutory damages up to the maximum extent permitted under the Lanham Act, as determined by the trier of fact.

55.     The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## VII.        THIRD COUNT

## (False Designation of Origin (15 U.S.C. § 1125))

56.     Nortel realleges each and every allegation set forth in Paragraphs 1 through 55, inclusive, and incorporates them by this reference herein.

57.     Defendants' unlawful activities as described above, including TelQuest's unauthorized sales of illegally upgraded Nortel products bearing Nortel's trademarks create a likelihood of confusion as to the affiliation, connection, and relationship of TelQuest and Nortel.

58.     Defendants' unlawful activities as described above, including TelQuest's unauthorized sales of illegally upgraded Nortel products bearing Nortel's trademarks, constitute false and misleading representations as to the origin of the Nortel products.

59.     Defendants' acts have caused and, unless restrained by this Court, will continue to cause Nortel and the public to suffer great and irreparable damage and injury through, *inter alia*, (1) a likelihood of confusion, mistake, and deception among the relevant purchasing public and trade, and (2) the loss of Nortel's valuable goodwill and business reputation symbolized by Nortel's marks.

60.     Nortel has suffered loss of profits and other damage, and Defendants have earned illegal profits, in an amount to be proven at trial, as the result of the aforesaid acts of Defendants.   Nortel may elect, at the time of trial, and in the alternative statutory damages up to the maximum extent permitted under the Lanham Act, as determined by the trier of fact.

61.     The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## VIII.      FOURTH COUNT
### (Trademark Dilution (15 U.S.C. § 1125))

62.     Nortel realleges each and every allegation set forth in Paragraphs 1 through 61, inclusive, and incorporates them by this reference herein.

63.     Defendants' unlawful activities as described above, including TelQuest's unauthorized sales of illegally upgraded Nortel products bearing Nortel's trademarks dilute the value of such famous marks.

64.     Defendants' unauthorized sales of illegally upgraded Nortel products has blurred and/or tarnished Nortel's famous trademarks, and has decreased the selling power of such marks.

65.     The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## IX.        FIFTH COUNT

### (Violation of the Digital Millenium Copyright Act (17 U.S.C. § 1201(a)))

66.    Nortel realleges each and every allegation set forth in Paragraphs 1 through 65, inclusive, and incorporates them by this reference herein.

67.    Defendants circumvented Nortel's technological measures to protect its GenKey Software by using an unauthorized copy of the GenKey Software to avoid and bypass KRS.

68.    Defendants' acts have caused Nortel damages in an amount to be proven at trial.

69.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## X.        SIXTH COUNT

### (Violation of the Digital Millenium Copyright Act (17 U.S.C. § 1201(b)))

70.    Nortel realleges each and every allegation set forth in Paragraphs 1 through 69, inclusive, and incorporates them by this reference herein.

71.    Defendants circumvented Nortel's technological measures to protect its GenKey Software by using an unauthorized copy of the GenKey Software to avoid and bypass KRS.

72.    Defendants' unauthorized use of an illegal copy of the GenKey Software is primarily designed to circumvent KRS and have no commercial value other than circumventing KRS.

73.    Defendants have trafficked, offered to sell, and sold illegally upgraded Nortel products.

74.    Defendants' acts have caused Nortel damages in an amount to be proven at trial.

75.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## XI.        SEVENTH COUNT
### (Passing Off (N.J.S.A. §§ 56:4-1 & 56:4-2))

76.    Nortel realleges each and every allegation set forth in Paragraphs 1 through 75, inclusive, and incorporates them by this reference herein.

77.    Defendants sold Nortel products that Defendants were not authorized to sell.

78.    Defendants are believed to deal in used Nortel products.  Only authorized dealers are permitted to sell new and/or upgraded Nortel products.

79.    Defendants' sales of illegally upgraded new and used Nortel products proximately caused Nortel and the public to suffer great and irreparable damage and injury through, *inter alia*, (1) a likelihood of confusion, mistake, and deception among the relevant purchasing public and trade, and (2) the loss of Nortel's valuable goodwill and business reputation symbolized by Nortel's marks.

80.    Nortel has suffered loss of profits and other damage, and Defendants have earned illegal profits, in an amount to be proven at trial, as the result of the aforesaid acts of Defendants.

81.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## XII.        SEVENTH COUNT

### (Trademark Infringement (N.J.S.A. §§ 56:4-1 & 56:4-2))

82.    Nortel realleges each and every allegation set forth in Paragraphs 1 through 81, inclusive, and incorporates them by this reference herein.

83.    Defendants' aforesaid unlawful acts constitute trademark infringement under New Jersey State law.

84.    Defendants' acts have caused Nortel damages in an amount to be proven at trial.

85.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## XIII.        EIGHTH COUNT

### (Trafficking in Counterfeit Marks (N.J.S.A. §§ 56:3-13.16))

86.    Nortel realleges each and every allegation set forth in Paragraphs 1 through 85, inclusive, and incorporates them by this reference herein.

87.    Defendants' aforesaid unlawful acts constitute trademark infringement under New Jersey State law.

88.    Nortel did not consent to Defendants' illegal sales of the Nortel products, which were likely to cause confusion or deception as to the origin of the "upgraded" products.

89.    Defendants' acts have caused Nortel damages in an amount to be proven at trial.

90.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## XIV.      NINTH COUNT

### (Unfair Competition)

91.     Nortel realleges each and every allegation set forth in Paragraphs 1 through 90, inclusive, and incorporates them by this reference herein.

92.     Defendants' aforesaid acts of infringement constitute "unfair competition" under New Jersey State law.

93.     These wrongful acts have interfered with Nortel's ability to conduct its business and have proximately caused and will continue to cause Nortel substantial injury, including loss of customers, dilution of its goodwill, confusion for potential customers, injury to its reputation, and diminution in value of its confidential information and other proprietary information.  These actions will cause imminent irreparable harm and injury to Nortel, the amount of which will be difficult to ascertain, if they continue. Nortel is without an adequate remedy at law.

94.     Nortel is entitled to an injunction restraining Defendants, their officers, agents, employees, and all persons acting in concert with Defendants, from engaging in further such unlawful conduct.

95.     Nortel is further entitled to recover from Defendants the damages it has sustained and will sustain as a result of Defendants' wrongful acts as hereinabove alleged.  The amount of such damages cannot be determined at this time.  Nortel is also entitled to recover from Defendants the gains, profits, and advantages they have obtained as a result of their wrongful acts as hereinabove alleged.  Nortel is unable to ascertain at this time the full extent of the gains, profits, and advantages Defendants have obtained by reason of their aforesaid unlawful conduct.

96.     The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## XV.   TENTH COUNT

### (Conversion)

97.     Nortel re-alleges each and every allegation set forth in Paragraphs 1 through 96, inclusive, and incorporates them by this reference herein.

98.     By reason of the foregoing acts and conduct, Defendants have unlawfully and wrongfully converted for their own use the GenKey Software and Keycodes belonging to Nortel for purposes of selling or distributing unauthorized copies of the GenKey Software or the Nortel Keycodes.

99.     As a direct and proximate result of the unlawful conversion of the GenKey Software and the Nortel Keycodes, Nortel has been damaged in an amount not yet fully ascertained, but which is not less than $75,000.00.

100.    The conduct of Defendants was fraudulent, oppressive, malicious, and in conscious disregard of the rights of Nortel, and Nortel is therefore entitled to punitive and/or exemplary damages against them.

## PRAYER FOR RELIEF

**WHEREFORE**, Nortel prays for judgment against defendants as to all counts of its complaint as follows:

a.     That Defendants each be held to have infringed Nortel's copyrights in the GenKey Software.

b.     That Defendants each be held to have infringed Nortel's trademarks.

c.     That Defendants have violated the Lanham Act, 15 U.S.C. § 1125, by engaging in unfair competition, including, trademark dilution and false designation of origin.

d.     That Defendants have violated the Digital Millenium Copyright Act, 17 U.S.C. § 1201.

e.      That Defendants violated New Jersey statutory law, including Sections 56:4-1, 56:4-2, and 56:3-13.16.

f.      That Defendants be held to have committed acts of unfair competition.

g.      That Defendants each be held to have unlawfully converted the GenKey Software.

h.      That Defendants and Defendants' directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined from directly or indirectly infringing Nortel's copyrights in the GenKey Software or continuing to market, offer, sell, dispose of, license, lease, transfer, display, advertise, reproduce, develop or manufacture any works derived or copied from the GenKey Software or to participate or assist in any such activity.

i.      That Defendants and Defendants' directors, officers, agents, servants, employees, and all other persons in active concert or privity or in participation with them, be enjoined to return to Nortel any originals, copies, or duplicates of the GenKey Software or the Nortel Keycodes, in any form, in their possession, custody or control.

j.      That Defendants each be enjoined to deliver upon oath, to be impounded during the pendency of this action, and for destruction pursuant to judgment herein, all originals, copies, or duplicates of any work shown by the evidence to infringe any Nortel copyright.

k.      That judgment be entered for Nortel against Defendants for Nortel's actual damages according to proof, and for any additional profits attributable to infringements of Nortel's copyrights.

l.      That judgment be entered for Nortel and against Defendants for statutory damages based upon Defendants' wrongful acts.

m.   That Defendants each be required to account for all gains, profits, and advantages derived from their acts of infringement and for their other violations of law.

n.   That all gains, profits, and advantages derived by Defendants from their acts of infringement and other violations of law be deemed to be in a constructive trust for the benefit of Nortel.

o.   That judgment be entered for Nortel and against Defendants, for trebling the amount of the damages award.

p.   That Nortel be awarded punitive and exemplary damages against Defendants.

q.   That Nortel have judgment against Defendants for its costs and attorneys' fees.

r.   That the Court grant such other, further, and different relief as the Court deems proper under the circumstances.

BECKER MEISEL LLC
Attorneys for Plaintiffs


By:    s/ Daniel J. O'Hern, Jr.
         Daniel J. O'Hern, Jr.


Dated: December 4, 2007

## <u>DEMAND FOR JURY TRIAL</u>

The plaintiffs hereby demand a trial by jury on all issues so triable before a jury.

BECKER MEISEL LLC
Attorneys for Plaintiffs


By:   s/ Daniel J. O'Hern, Jr.
        Daniel J. O'Hern, Jr.


Dated: December 4, 2007

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I hereby certify that the within matter in controversy is not the subject of any other action pending in any court, or of a pending arbitration proceeding. No other action or arbitration proceeding is contemplated and I know of no other parties who should be joined in this action at this time.

BECKER MEISEL LLC
Attorneys for Plaintiffs


By:   s/ Daniel J. O'Hern, Jr.
        Daniel J. O'Hern, Jr.


Dated: December 4, 2007

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 201.1(d)(3)</u>

I hereby certify that the damages recoverable exceed the sum of $150,000, exclusive of interest and costs.

BECKER MEISEL LLC
Attorneys for Plaintiffs


By:   s/ Daniel J. O'Hern, Jr.
        Daniel J. O'Hern, Jr.


Dated: December 4, 2007



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Oct 18 04:06:20 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | **SEARCH OG** | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

[ Logout ]  Please logout when you are done to release system resources allocated for you.

[ Start ]  List At:          OR  [ Jump ]  to record:              **Record 106 out of 131**

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

| | |
|---|---|
| **Word Mark** | **NORTEL** |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: telephone and telecommunication equipment; namely, central office, local, tandem, and gateway switches; wire and wireless private automatic branch switches; data packet network switches; frame relay switches; remote switches; cellular mobile telephone switches; base site controllers, transceivers and test bays; microwave radios and transmission systems, automated attendant switches; traffic billing operator terminals; headsets; telephone jacks; line connectors; video and text terminals; maintenance administrative terminals; copper cable; patch panels; mechanical splices; cable strippers; couplers; attenuators; multiplexors; line concentrators; multiplex terminals; loop carriers; short to long haul inter-office transmission hardware; analog and digital radios; antenna; codecs; channel banks; repeaters; repeater and span lines; network local test cabinets; network remote test units; network loop reporting and test systems; network test operational support systems; digital announcers; billing media converters; paging and response systems comprising key services modules and hand free terminals; rectifiers; direct current to direct current converters; ringing machines; tone machines; telephone and transmission software; semiconductors; transformers; diodes; resistors; capacitors; transistors; tape drives; and read only memory on compact disk; computer telecommunication software for recording, storing and delivering voice messages; automatic call distribution software; intelligent networks comprising signal transfer switching point link software, and signal control point databases; optical sources and optical detectors. FIRST USE: 19950905. FIRST USE IN COMMERCE: 19950905 <br><br> (CANCELLED) IC 037. US 100 103 106. G & S: [installation, maintenance and repair services in the field of telecommunication equipment]. FIRST USE: 19950626. FIRST USE IN COMMERCE: 19950626 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 74233687 |
| **Filing Date** | December 27, 1991 |
| **Current Filing Basis** | 1A |

EXHIBIT A

| | |
|---|---|
| **Original Filing Basis** | 1B |
| **Published for Opposition** | December 29, 1992 |
| **Change In Registration** | CHANGE IN REGISTRATION HAS OCCURRED |
| **Registration Number** | 2001714 |
| **Registration Date** | September 17, 1996 |
| **Owner** | (REGISTRANT) Northern Telecom Limited CORPORATION CANADA World Trade Centre of Montreal 8th Floor 380 St. Antoine Street West Montreal, Quebec CANADA H2Y 3X7 |
| | (LAST LISTED OWNER) **NORTEL** NETWORKS LIMITED CORPORATION BY CHANGE OF NAME, BY CHANGE OF NAME, BY CHANGE OF NAME CANADA 2351 BOULEVARD ALFRED -NOBEL ST. LAURENT QUEBEC CANADA H4S 2A9 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | LISA PELLER LONDON |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). PARTIAL SECTION 8(10-YR) 20060606. |
| **Renewal** | 1ST RENEWAL 20060606 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | *e*BUSINESS | HELP | PRIVACY POLICY

EXHIBIT A



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Oct 18 04:06:20 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At:    OR Jump | to record:    **Record 107 out of 131**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# NORTEL

| **Word Mark** | **NORTEL** |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: telecommunication equipment, namely, central office, local, tandem, and gateway switches; wire and wireless private automatic branch switches; key telephone switches; data packet network switches; frame relay switches; remote switches; cellular mobile telephone switches; synchronized optical network access, transport and switching nodes; base site controllers, transceivers and test bays; microwave radio systems which include transmitters, receivers, repeaters, digital processors, and operating software; and transmission systems which include channel banks, multiplexers, digital loop carriers, digital cross connects, fibre feeders, copper feeders, radio transmitters and operating software; automated attendant switches; workstation comprising a database and visual display terminals that provide traffic billing, call completion, and assistance features; switching software; residential, public, business, and mobile/cordless telephone sets; headsets; telephone jacks; line connectors; video and text terminals; man-machine interface workstations comprising database and visual display terminal that provide integrated maintenance and administration features for telecommunication switching systems; copper cable; optical fiber cable; submarine cable; electrical protectors; connectors used to connect or terminate telephone wires to central office, key system, or PBX switching systems; cable terminals to provide protective and inter-connection terminals for feeder cables; indoor and outdoor frames to allow in-coming trunk lines to be cross connected with local telephone lines at a switching system; mechanical cable splicers and strippers to splice or strip cables; attenuators; multiplexors; line concentrators; multiplex terminals both digital and fibre which allow a number of voice (or other) channels to be transmitted over a single set of wires. loop carriers to transmit voice channels over a distance either through telephone poles with a repeater system or through a fibre optic transmission system; analog and digital radios; antenna; coder-decoders ("CODECS") to convert voice signals from analog form to digital signals acceptable to PBXs and other transmission systems and then covert the data back to analog; channel banks; repeaters; repeater and span lines; network local test units to test local loops, central office subscriber line equipment, etc. from a control point, usually a network node or central office; network remote test units |

EXHIBIT B

to test loops, office subscriber line equipment, etc. from a remote location; network loop reporting and test systems comprising a computer and operating software designed to provide information related to operating system needed repairs; digital announcers; billing media converters; paging and response systems comprising key services modules and hand free terminals; power plants containing batteries, monitors, alarms, fuses, breakers, rectifiers, transformers, and control panels; electrical power supplies; rectifiers; direct current to direct current converters; ringing machines; tone machines; telephone operating software; integrated circuits; semiconductors; transformers; diodes; resistors; capacitors; transistors; printed circuit boards; magnetic tapes; both blank and prerecorded for use in connection with operating and applications software; tape drives; read only memory on compact disk, both blank and prerecorded for use in connection with operating and applications software; computer telecommunication software for recording, storing, and delivering voice messages; automatic call distribution software; intelligent networks comprising signal transfer/switching point link software and signal control point databases; optical sources comprising lasers, LEDs, semiconductor chips, optical receivers, modules, and amplifiers; and optical detectors. FIRST USE: 19951115. FIRST USE IN COMMERCE: 19951115

| | |
|---|---|
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.07.07 - Astronomic orbits; Globes with rings or orbits |
| **Serial Number** | 74599657 |
| **Filing Date** | November 16, 1994 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | May 20, 1997 |
| **Registration Number** | 2184321 |
| **Registration Date** | August 25, 1998 |
| **Owner** | (REGISTRANT) Northern Telecom Limited CORPORATION CANADA World Trade Centre of Montreal 8th Floor 380 St. Antoine Street West Montreal, Quebec CANADA H2Y 3X7 |
| | (LAST LISTED OWNER) **Nortel** Networks Inc. CORPORATION DELAWARE The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington DELAWARE 19801 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | LISA PELLER |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST
NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

EXHIBIT B

**|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY**

 **United States Patent and Trademark Office**

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Oct 18 04:06:20 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout Please logout when you are done to release system resources allocated for you.

Start List At: [          ] OR Jump to record: [          ] **Record 70 out of 131**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

## Typed Drawing

**Word Mark** **NORTEL** NETWORKS

**Goods and Services** IC 009. US 021 023 026 036 038. G & S: Telecommunication equipment, namely, telephones, telephone switches; wireless communications equipment, namely, cellular mobile telephones, cellular mobile telephone switches, base stations, satellites, microwave radio and transmission systems, namely, microwave radios, repeaters, regenerators, and digital processors; transmitter/receiver digital processors, transmission equipment, namely, copper cable, fiber optic cable; transmitters, transceivers, receivers, repeaters, multiplexors, digital span lines and trunks; digital processors; Internet telephony, voice, computer, and data networking telecommunication equipment, namely, routers, bridges, hubs, ethernet switches, ethernet PC cards, servers; Internet appliances, namely, firewalls, caching, load balancing, and traffic managing; Internet telephony, network managers and controllers, fiber optic transport equipment for broadband connectivity using photonic wave division multiplexing, namely, optical network interfaces, programmable transport terminals, cross connect apparatus, namely, cross-connect frames, and fiber-optic data links; and operational and applications software to operate all of the aforesaid goods

IC 035. US 100 101 102. G & S: Retail and wholesale distributorship services in the field of telecommunications equipment

IC 037. US 100 103 106. G & S: Installation, maintenance, and repair services for telecommunications equipment

IC 038. US 100 101 104. G & S: Communication services, namely, telephone, facsimile, and data transmission services

IC 042. US 100 101. G & S: Engineering services for telecommunications and data networking

**Mark Drawing Code** (1) TYPED DRAWING

**Serial Number** 75544171

EXHIBIT C

| | |
|---|---|
| **Filing Date** | August 27, 1998 |
| **Current Filing Basis** | 44E |
| **Original Filing Basis** | 1B;44D |
| **Published for Opposition** | January 28, 2003 |
| **Registration Number** | 2757769 |
| **Registration Date** | September 2, 2003 |
| **Owner** | (REGISTRANT) **NORTEL** NETWORKS LIMITED CORPORATION CANADA 2351 BOULEVARD ALFRED-NOBEL ST. LAURENT, QUEBEC CANADA H4S 2A9 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | LISA F PELLER LONDON |
| **Priority Date** | July 20, 1998 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "NETWORKS" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

EXHIBIT C



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Oct 18 04:06:20 EDT 2007*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: _____   OR   Jump   to record: _____   **Record 39 out of 131**

| TARR Status | ASSIGN Status | TDR | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

# NORTEL NETWORKS

| | |
|---|---|
| **Word Mark** | NORTEL NETWORKS |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: TELECOMMUNICATION EQUIPMENT, NAMELY, TELEPHONES; TELEPHONE SWITCHES; WIRELESS COMMUNICATIONS EQUIPMENT, NAMELY, CELLULAR MOBILE TELEPHONES, CELLULAR MOBILE TELEPHONE SWITCHES, BASE STATIONS, TRANSMITTERS, TRANSCEIVERS, RECEIVERS, REPEATERS, MULTIPLEXORS, CONTROLLERS, ANTENNAS, TEST BAYS, MICROWAVE RADIOS, REPEATERS AND REGENERATORS; TRANSMITTER/RECEIVER DIGITAL PROCESSORS; TRANSMISSION EQUIPMENT, NAMELY, COPPER CABLE, FIBER OPTIC CABLE; TRANSMITTERS, TRANSCEIVERS, RECEIVERS, REPEATERS, MULTIPLEXORS, DIGITAL SPAN LINES AND TRUNKS, DIGITAL PROCESSORS; GLOBAL COMPUTER NETWORK, TELEPHONY, VOICE, COMPUTER AND DATA NETWORKING TELECOMMUNICATION EQUIPMENT, NAMELY, ROUTERS, BRIDGES, HUBS, ETHERNET SWITCHES, ETHERNET PC CARDS, SERVERS, GLOBAL COMPUTER NETWORK APPLIANCES, NAMELY, FIREWALLS AND EQUIPMENT FOR CACHING, LOAD BALANCING AND TRAFFIC MANAGING; GLOBAL COMPUTER NETWORK TELEPHONY, NETWORK MANAGERS AND CONTROLLERS, FIBER OPTIC TRANSPORT EQUIPMENT FOR BROADBAND CONNECTIVITY USING PHOTONIC WAVE DIVISION MULTIPLEXING, NAMELY, OPTICAL NETWORK INTERFACES, PROGRAMMABLE TRANSPORT TERMINALS, CROSS CONNECT APPARATUS AND FIBER OPTICAL DATA LINKS; AND SOFTWARE TO OPERATE ALL THE AFORESAID GOODS. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227<br><br>IC 035. US 100 101 102. G & S: RETAIL AND WHOLESALE DISTRIBUTORSHIP SERVICES FOR TELECOMMUNICATIONS AND DATA NETWORKING EQUIPMENT. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227 |

EXHIBIT D

IC 037. US 100 103 106. G & S: INSTALLATION, MAINTENANCE, AND REPAIR SERVICES FOR TELECOMMUNICATIONS AND DATA NETWORKING EQUIPMENT. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227

IC 038. US 100 101 104. G & S: COMMUNICATION SERVICES, NAMELY, TELEPHONE, FACSIMILE, AND DATA TRANSMISSION SERVICES. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227

IC 041. US 100 101 107. G & S: TRAINING SERVICES, NAMELY, SEMINARS, WORKSHOPS, AND CLASSES FOR TELECOMMUNICATIONS AND DATA NETWORKING. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227

IC 042. US 100 101. G & S: ENGINEERING SERVICES FOR TELECOMMUNICATIONS AND DATA NETWORKING. FIRST USE: 19981227. FIRST USE IN COMMERCE: 19981227

| | |
|---|---|
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.07.25 - Globes, other<br>27.03.05 - Objects forming letters or numerals |
| **Serial Number** | 75553777 |
| **Filing Date** | September 16, 1998 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | July 24, 2001 |
| **Registration Number** | 2663562 |
| **Registration Date** | December 17, 2002 |
| **Owner** | (REGISTRANT) **NORTEL** NETWORKS CORPORATION CORPORATION CANADA 380 ST. ANTOINE STREET WEST, 8TH FLOOR WORLD TRADE CENTER OF MONTREAL MONTREAL, QUEBEC CANADA H2Y 3Y4 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Lisa F. Peller |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "NETWORKS" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   TOP   HELP   PREV LIST   CURR LIST

NEXT LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

EXHIBIT D



O P I C
Office de la propriété
intellectuelle du Canada

C I P O
Canadian Intellectual
Property Office

*Droit d'auteur*

*Copyright*

*Certification*

*Certification*

Le(la) soussigné(e) certifie par la présente que le document ci-joint est une copie authentique :

The undersigned hereby certifies that the attached document is a true copy of:

Certificat d'enregistrement de droit d'auteur no. 1021288 tel qu'enregistré le 10 juin 2004.

Certificate of registration of copyright no. 1021288 as registered on June 10, 2004.

**Émis** - le 2 mai 2006

**Issued** – May 2, 2006

_Bédard_

Agent certificateur / Certifying Officer



(CIPO 146)



EXHIBIT E



**Office de la propriété
intellectuelle
du Canada**

Un organisme
d'Industrie Canada

**Canadian
Intellectual Property
Office**

An Agency of
Industry Canada

*Certificate of Registration of*

# *Copyright*

*Certificat d'enregistrement du*

# *Droit d'auteur*

*This Certificate of Registration is issued pursuant to sections 49 and 53 of the Copyright Act. The copyright in the work described below was registered on the date of registration as follows:*

*Ce certificat d'enregistrement est émis conformément aux articles 49 et 53 de la Loi sur le droit d'auteur. Le droit d'auteur sur l'oeuvre décrite ci-dessus, a été enregistré à la date d'enregistrement comme suit :*

Date of Registration - Date d'enregistrement : **June 10, 2004**

Registration No. - Numéro d'enregistrement : **1021288**

First Publication - Première publication : **Unpublished**

Title - Titre : **GenKey Application Software**

Category - Catégorie : **Literary**

Owner(s) - Titulaire(s) :
**Nortel Networks Limited
8200 Dixie Road, Suite 100
Brampton, Ontario
Canada, L6T 5P6**

Author(s) - Auteur(s) :
**Paul Canvin**

**Raymond Garry Joseph Dan:**

Date of Issuance of Certificate - Date d'émission du certificat : **May 2, 2006**

Registrar of Copyrights
Copyright Office

Registraire des droits d'auteur
Bureau du droit d'auteur

**EXHIBIT A**

# Canada

(CIPO 00200)
01-09-05

EXHIBIT E

O P I C    C I P O

DANIEL J. O'HERN, JR., ESQ. (DO0138)
BECKER MEISEL LLC
499 Broad Street
Shrewsbury, New Jersey 07702
(732) 576-8700

SCOTT J. FERRELL, Cal. Bar No. 202091 (*pro hac vice pending*)
DAVID R. SUGDEN, Cal. Bar No. 218465 (*pro hac vice pending*)
CALL, JENSEN & FERRELL
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
(949) 717-3000

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NORTEL NETWORKS LIMITED, a Canadian corporation; NORTEL NETWORKS, INC., a Delaware corporation<br><br>Plaintiffs,<br><br>vs.<br><br>TELQUEST INTERNATIONAL CORPORATION, a New Jersey Corporation; ALFRED ADEL, an Individual; and DANNY PEKAR, an Individual<br><br>Defendants. | Case No. 07-5294 (KSH)(PS)<br><br>**CERTIFICATION OF FILING AND SERVICE**<br><br><br><br><br><br>"Document Electronically Filed" |

I hereby certify that the accompanying Amended Complaint has on this day been filed electronically with the United States District Court for the District of New Jersey and all counsel of record who participate in the electronic filing program of the Court.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

BECKER MEISEL LLC
Attorneys for Plaintiffs


By:___s/ Daniel J. O'Hern, Jr.
        Daniel J. O'Hern, Jr.


Dated: December 4, 2007